## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF PENNSYLVANIA

RUSSELL E. KLING, M.D.,

        Plaintiff,

        v.                            Civil Action Number:

UNIVERSITY OF PITTSBURGH
MEDICAL CENTER, UNIVERSITY
HEALTH CENTER OF PITTSBURGH,
d/b/a UPMC MEDICAL EDUCATION,
and VU T. NGUYEN, M.D.,

        Defendants.

### COMPLAINT

AND NOW, comes the plaintiff, Russell E. Kling, M.D., by and through his attorney and files the following Complaint for claims under the Americans with Disabilities Act, as amended, the Rehabilitation Act, and the Pennsylvania Human Relations Act, and for tortious interference with prospective contract, and alleges as follows.

### Parties

1.    The plaintiff, Russell E. Kling, M.D. (hereinafter referred to as "Dr. Kling" or "Plaintiff") is an adult individual, residing in Pittsburgh, Pennsylvania (Allegheny County).

2.    The defendants, University of Pittsburgh Medical Center ("UPMC") and University Health Center of Pittsburgh, d/b/a UPMC Medical Education ("GME") (collectively referred to as "UPMC Entities") are non-profit corporations with their principal place of business located in Pittsburgh, Pennsylvania.

3.    Vu T. Nguyen, M.D. is an adult individual, residing in Pittsburgh, Pennsylvania (Allegheny County) subject to individual liability for aiding and abetting under the Pennsylvania Human Relations Act and under the claim for tortious interference with contract.

## Jurisdiction and Venue

4.      This Court has jurisdiction under the Americans With Disabilities Act, ("ADAAA"), 42 U.S.C. §§12101, et. seq., Section 504 of the Rehabilitation Act of 1973, as amended, ("Rehabilitation Act"), 29 U.S.C. §794 et. seq., and the Pennsylvania Human Relations Act, as amended ("PHRA"), PA. STAT. ANN. Title 43 §§951 et. seq.  Plaintiff seeks declaratory, injunctive and compensatory and punitive relief for denial of employment on the basis of disability, regarded as, record of disability as defined by the applicable statutes and/or denial of a reasonable accommodation, improper medical inquiries and retaliation by the UPMC Entities.

5.      Venue is properly laid in this district pursuant to 28 U.S.C. §1391(b) because the defendants reside within this district and a substantial part of the events giving rise to the claim occurred in this district.

6.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§1331 and 1343. This action is authorized and instituted pursuant to Section 504 of the Rehabilitation Act and under the ADAAA and PHRA.

7.      The UPMC Entities are covered employers within the meaning of the Rehabilitation Act and ADA because, among other things, they employ the requisite number of employees during the relevant time period.

8.      Dr. Kling was denied employment because of his disability, or was regarded as disabled, based on a perception that he was substantially limited in one or more major life activities and/or was regarded as disabled or record of disability by defendants that this disability prevented him from performing the job held or desired and was refused an accommodation for this medical condition. At all times relevant to this lawsuit, Dr. Kling was a qualified individual

2

with a disability who possessed the requisite qualifications to perform the essential functions of a resident, with or without an accommodation.

9.      At all relevant times, the UPMC Entities received federal financial assistance, thereby rendering Section 504 of the Rehabilitation Act applicable to its employment programs and activities.

## Statement of Facts

10.      Dr. Kling was paid as a resident physician in the Department of Plastic Surgery at UPMC from July 1, 2014, until June 30, 2017. Following disclosure of a learning disability and a request for reasonable accommodations, Dr. Kling was told to submit for a drug and alcohol test, placed on administrative leave, terminated due to contract non-renewal, and retaliated against through false statements and disclosure of medical information resulting in the denial of educational and employment opportunities internally at UPMC and externally.

## I.      Background

11.      In August 2011, Dr. Kling took a voluntary leave of absence from medical school and moved from Boston, Massachusetts, to Pittsburgh, Pennsylvania, to work as an unpaid research fellow at the UPMC Department of Plastic Surgery's Adipose Stem Cell Center under the direction of J. Peter Rubin, M.D. ("Dr. Rubin"), Chairman of UPMC Department of Plastic Surgery.  Dr. Kling volunteered full-time at the Adipose Stem Cell Center from August 2011 through August 2013, publishing a number of peer reviewed articles and giving presentations at various plastic surgery meetings as a representative of UPMC.

12.      During his fourth year of medical school, Dr. Kling matched at UPMC in the Department of Plastic Surgery's six-year integrated residency program. Dr. Kling began his employment at UPMC as a post-graduate year 1 ("PGY-1") resident on July 1, 2014.

13.     After successfully completing PGY-1 in plastic surgery at UPMC, Dr. Kling was promoted to post-graduate year 2 ("PGY-2") and his annual contract was renewed.

14.     After completing PGY-2 in plastic surgery, Dr. Kling began his post-graduate year 3 ("PGY-3") on July 1, 2016 without an executed annual reappointment contract.

15.     On or about July 6, 2016, Dr. Kling met with Dr. Nguyen, newly appointed Residency Program Director of UPMC Department of Plastic Surgery, and Joseph E. Losee, M.D. ("Dr. Losee"), Executive Vice Chair of UPMC Department of Plastic Surgery, for his annual residency review meeting to discuss his PGY-2 evaluations. Dr. Kling was informed that he would be promoted to PGY-3, as was recommended by approximately 95% of the evaluating faculty members.

16.     During his two research years, PGY-1, and PGY-2, Dr. Kling published thirteen peer reviewed articles, published a book chapter in a plastic surgery textbook, gave more than twenty-nine presentations at various plastic surgery conferences, including the prestigious American Association of Plastic Surgery meeting in 2015 where he was one of few UPMC Plastic Surgery residents to be accepted. In addition, Dr. Kling was asked to be a member on the esteemed American Society of Plastic Surgeons' Legislative Advocacy Committee.

17.     As a PGY-1, Dr. Kling scored in the 55th percentile among his peers on the national plastic surgery in-service training examination. As a PGY-2, Dr. Kling scored in the 54th percentile on this same exam. Dr. Kling was not allowed to take the plastic surgery in-service examination as a PGY-3.

## II.     <u>Discrimination During PGY-3</u>

18.     At the end of June 2016, it was announced that Dr. Nguyen would become the new Residency Program Director of UPMC Department of Plastic Surgery, a position previously held by Dr. Losee.

19.     Dr. Kling's first rotation of PGY-3 training was at UPMC Magee-Womens Hospital, where he worked extensively under the guidance of Dr. Nguyen.

20.     On or about August 10, 2016, Dr. Nguyen initiated a meeting with himself, Dr. Kling, Dr. Losee, and William D. Tobler, Jr., M.D. ("Dr. Tobler"), Administrative Chief Resident of UPMC Department of Plastic Surgery, to discuss his concerns regarding Dr. Kling's technical performance and lack of medical knowledge. At this meeting, an "individualized educational plan" was implemented to help with Dr. Kling's performance. As part of this plan, Dr. Kling was required him to meet with one or two co-residents, including Dr. Tobler, and some faculty members to discuss plastic surgery topics for one to two hours per week. In addition, Dr. Kling was required to reach out to UPMC's Resident and Fellow Assistance Program ("RFAP") for confidential counseling under the supervision of Cliff Cohen ("Cohen"), Clinical Director of RFAP. Dr. Kling was told that the defendants would make any and all necessary resources available to him because the department was committed to his success. However, Dr. Kling was also warned that if his performance did not improve, he might have to repeat PGY-3 clinical training.

21.     On or about September 8, 2016, Dr. Kling's PGY-3 reappointment contract with UPMC was finalized. The reappointment agreement was in effect from July 1, 2016 to June 30, 2017.

22.     On or about September 14, 2016, Dr. Nguyen requested another meeting with himself, Dr. Kling, Dr. Losee, and Dr. Tobler to discuss further concerns about Dr. Kling's performance. During the meeting, Dr. Kling was probed about possible substance abuse and/or personal issues, which he denied. Again, Dr. Kling was told that the defendants would make any and all necessary resources available to him because they were committed to his success. Dr. Kling was warned again that if his performance did not improve he might have to repeat PGY-3 clinical training.

23.     In early October 2016, Dr. Kling gave a presentation at a weekly conference and accidentally included a slide from the prior week's presentation. That night, Dr. Kling was surprised to receive a call from Dr. Nguyen to discuss this small mistake, who characterized it as "gross negligence" and stated that this lack of detail could in the clinical setting result in subsequent patient morbidity and/or mortality.

24.     On the morning of October 10, 2016, after Dr. Kling had operated with Dr. Nguyen, Dr. Nguyen demanded to speak with Dr. Kling's wife. Dr. Kling called his wife and urged her to call Dr. Nguyen. During the phone call, Dr. Nguyen asked Dr. Kling's wife numerous personal and probing questions, including questions related to drug and/or alcohol abuse.

25.     That same day, Dr. Kling met with Dr. Nguyen and Dr. Rubin. During this meeting Dr. Kling disclosed that he has a learning disability and presented a written letter explaining the disability. No changes were implemented to Dr. Kling's "individualized educational plan" despite the disclosure. During this meeting, Dr. Kling was instructed to schedule appointments with a primary care physician and a psychiatrist to initiate medical evaluations Dr. Kling was again informed that the defendants would make any and all necessary

resources available to him because they were committed to his success. However, Dr. Kling was informed for the first time that if his performance did not improve he might not complete the residency program.

26.     It was later revealed in the minutes of this meeting that Dr. Nguyen was actively investigating Dr. Kling's progress at RFAP by demanding Cohen update him on all matters related to Dr. Kling, including Dr. Kling's learning disability, despite the fact that Dr. Kling signed a confidentiality agreement with RFAP explicitly prohibiting such disclosures. Upon information and belief, Dr. Nguyen also attempted to contact the psychiatrist at UPMC who evaluated Dr. Kling in order to obtain medical information.

27.     Dr. Nguyen gave Dr. Kling his minutes from their meetings on September 14, 2016, and October 10, 2016, and requested that Dr. Kling sign these meeting minutes. Dr. Kling refused to sign the meeting minutes, as the documents were replete with factual errors and mischaracterizations. Instead, Dr. Kling wrote and signed an addendum to attach to the meeting minutes pointing out the errors and mischaracterizations.

28.     Throughout the remainder of 2016, Dr. Kling continued to work hard and improve his performance. Indeed, on December 2, 2016, Dr. Nguyen noted in an email to Dr. Kling "I hope and hear things are improving."

29.     As part of the semi-annual review process for residents, the UPMC Department of Plastic Surgery Clinical Competency Committee ("CCC") meets each year in December and June to review each resident's performance. Dr. Kling was informed that on December 21, 2016 the CCC would be deciding whether he would be put on probation and whether he would have to repeat PGY-3 clinical training.

30.    On December 16, 2016, Dr. Kling met with Dr. Nguyen and Dr. Losee for his semi-annual residency review. During this meeting Dr. Kling was told to submit documentation to support his learning disability diagnosis. Dr. Kling was also told that the CCC would not be making any decisions about him until the documentation could be reviewed. There are no meeting minutes from the semi-annual residency review meeting.

31.    On December 20, 2016, Dr. Kling sent an email to UPMC Department of Plastic Surgery submitting a request for accommodations related to a learning disability that would permit a remedial year. Upon information and belief, remedial years have been provided to other resident physicians in the UPMC Department of Plastic Surgery and in other UPMC residency programs. In response to this request, Dr. Losee requested official documentation from the psychologist/psychiatrist who evaluated and diagnosed Dr. Kling.

32.    On or about January 6, 2017, Dr. Kling submitted to the defendants accessible documentation from his prior accommodation request for the MCAT (Medical College Admission Test). That same day, Dr. Nguyen requested a neuropsychological examination ("Neuropsych Exam") of Dr. Kling to be administered by UPMC.

33.    The Neuropsych Exam was organized by Cohen and administered by Sue Beers, Ph.D. ("Dr. Beers"), Professor of Psychiatry at the University of Pittsburgh. The testing was rushed over the course of three days in January of 2017.

34.    Dr. Kling received the results of the Neuropsych Exam via email from Dr. Nguyen on February 9, 2017, which confirmed that he has a learning disability. The neuropsychological report stated that Dr. Kling "may find a remedial year of highly focused accommodation and interventions will provide adequate learning support to succeed in his chosen medical specialty" or in the alternative he "may benefit from receiving mentorship with

the goal of collaboratively reassessing his area of medical specialty or reconsideration of his overall career path."

35.     No one in the UPMC Department of Plastic Surgery reached out to meet with Dr. Kling to discuss the ramifications of the Neuropsych Exam. Instead, on or about February 20, 2017, the CCC met to discuss Dr. Kling's performance and future in the residency program.

36.     On February 24, 2017, Dr. Kling met with Dr. Nguyen and Dr. Losee, who informed him that his annual contract would not be renewed because the Neuropsych Exam "demonstrates a learning disorder and lack of visual-spatial skills that make you ill-equipped for training in our specialty."

37.     Rather than providing an accommodation through the interactive process for Dr. Kling in his existing position in plastic surgery (by allowing a remedial year) or by transferring him to another specialty (as a reassignment accommodation), the UPMC Entities terminated his employment by not renewing his contract beyond June 30, 2017.

38.     Moments after being told that his contract would not be renewed on February 24, 2017, Dr. Kling was required to submit for drug and alcohol testing despite the lack of any reasonable cause or employment necessity.

39.     When Dr. Kling told Dr. Tobler that his contract would not be renewed, Dr. Tobler said that the decision seemed hasty and it was strange that the defendants did not let him finish PGY-3 and continue to improve his performance.

40.     Based upon information and belief, UPMC and related entities failed to follow and then conspired to change human resource policies in order to cover up its discriminatory and retaliatory conduct.

41.    Nonetheless, from February 24, 2017 until May 24, 2017, Dr. Kling continued to work as a PGY-3 plastic surgery resident, operating on patients daily under direct and indirect supervision of UPMC plastic surgery faculty.

42.    During this time, Dr. Kling started seeing Susan Oerkvitz, Ph.D., a psychologist at RFAP, to deal with the emotional distress of his non-renewal, as he had already dedicated five years – two years of research and three years of residency – to UPMC Department of Plastic Surgery and his pursuit of becoming a board certified plastic surgeon.

43.    Consistent with the Neuropsych Exam's alternative recommendation for collaborative reassessment of a medical specialty, UPMC Entities and individual defendants failed to engage in the interactive process of reassignment.

44.    On or about March 10, 2017, Dr. Kling met with Dr. Losee. Dr. Losee assured Dr. Kling that the defendants would support him in future employment opportunities, but did not offer any advice or guidance. Dr. Losee then preached about the importance of keeping the department updated on all of Dr. Kling's future plans, specifically what he intended to do next. It became clear to Dr. Kling that Dr. Losee had requested the meeting with the sole purpose of keeping the defendants informed about his next career move.

45.    In March 2017, Dr. Kling contacted the UPMC GME office to request his available funding and available positions.

46.    On March 30, 2017, Samantha Cascone, Director of GME Operations, informed Dr. Kling that "we do not have any positions that you would be eligible for in our system" and that he had two years of residency funding left. Dr. Kling inquired further into his funding because he should have had three years left of funding, as plastic surgery is a six-year residency

program and he was only in his third year of training.  He was never given an explanation for the missing year of funding.

47.     On June 30, 2017, Dr. Kling's last day as an employee at UPMC, Dr. Nguyen emailed Dr. Kling a self-serving letter denying retaliation against Dr. Kling and stating  "I hope someday you will come to appreciate that all of us, particularly me, but also Dr. Losee, Dr. Rubin and the faculty have from the very beginning been supportive of you, as we are of all residents."

48.     On or about August 22, 2017, Dr. Kling submitted a charge with the Equal Employment Office Commission ("EEOC") for disability discrimination and retaliation. Dr. Kling submitted a rebuttal to the UPMC Entities' response to the EEOC on or about August 11, 2018.

**III.     Defendants' Retaliated Against Plaintiff**

49.     In order for Dr. Kling to be able to practice medicine and/or obtain new medical employment opportunities, he needed letters of recommendation from the defendants to verify his residency education and assure prospective employers that there were no global issues. Instead, the defendants retaliated against Dr. Kling, delaying essential letters and maligning his character.

**A.     Defendants Manufactured Plaintiff's Probation Status**

50.     On or about March 22, 2017, Dr. Kling asked Dr. Nguyen to write a letter to the Pennsylvania Board of Medicine ("PABM") to verify his residency education, as required to complete his unrestricted medical license application in Pennsylvania.

51.     On or about April 14, 2017, Dr. Nguyen sent Dr. Kling a draft of his letter to the PABM ("PABM Letter #1"). PABM Letter #1 was littered with errors, including wrong dates,

misspelling of Dr. Kling's name, and the assertion that Dr. Kling was on probation. PABM Letter #1 was the first time Dr. Kling learned of his probation status, and the first time this alleged probation status was documented. Relevant UPMC policies require that residents be notified in writing of adverse actions such as probation.

52.     Upon information and belief, every medical resident at the UPMC Entities who has not had his or her annual contract renewed has been placed on probation at least once before the decision was made to not be renewed.

53.     PABM Letter #1 also stated that there were no "global concerns raised regarding [Dr. Kling's] work ethic and professionalism."

54.     On April 20, 2017, Dr. Kling emailed Dr. Nguyen an edited version of PABM Letter #1 and asserted that he was never on probation.

55.     Thereafter, Dr. Nguyen pressured Dr. Kling into accepting his version of the facts regarding probation. For example, on April 27, 2017, Dr. Nguyen sent Dr. Kling an email "recommending" that Dr. Kling accept Dr. Nguyen's version of the facts. Otherwise, Dr. Nguyen wrote, "I fear that this and other related issues may only continue to plague you in the future."

56.     Because Dr. Kling refused to accept that he had been put on probation without any notice or documentation, Dr. Nguyen tried to cover up the lack of documentation by manufacturing a probation status for Dr. Kling in a letter dated April 26, 2017, that ostensibly summarized the events that occurred between December 2016 and February 24, 2017. Dr. Nguyen requested that Dr. Kling sign this retroactive documentation stating that he was put on probation during his semi-annual review on December 16, 2016, despite the fact that there are no minutes from this meeting and UPMC policies require that residents be notified in writing of adverse actions such as probation. Dr. Kling refused to sign this letter.

57.     On May 1, 2017, Dr. Nguyen sent Dr. Kling a revised version of his letter to the PABM ("PABM Letter #2). In PABM Letter #2, Dr. Nguyen corrected the dates and spelling errors, but did not remove the assertion about probation. Additionally, the sentence regarding work ethic and professionalism had been removed. Dr. Kling refused to accept PABM Letter #2 because it continued to inaccurately document probation.

58.     On May 3, 2017, Dr. Nguyen emailed Dr. Kling and stated that he would not revise PABM Letter #2, as he had "been fairly accommodating in this process" by allowing Dr. Kling to correct the dates and spelling of his name in the previous version. Dr. Nguyen refused to remove reference to probation because he said it "represents the department's documentation." Dr. Nguyen further stated that he could either move forward with the current version of the letter or simply not provide a letter to PABM. Essentially, Dr. Nguyen used the letter to the PABM to blackmail Dr. Kling into accepting that he was put on probation despite a lack of notification and/or documentation. Dr. Nguyen knew that Dr. Kling could not receive his unrestricted medical license without a letter from UPMC.

59.     On May 4, 2017, Dr. Kling met with Dr. Rubin to express his concerns regarding Dr. Nguyen's interference with his unrestricted medical license and prospective employment opportunities. Dr. Rubin did not intervene and recommended Dr. Kling meet with Dr. Nguyen to discuss their issues.

60.     In an effort to obtain new employment, on or about May 10, 2017, Dr. Kling requested a letter of good standing from the defendants. In response, that same day, Dr. Losee emailed Dr. Kling stating that the department could not provide him with a letter of good standing because there are "simple honest facts that can not be ignored (i.e. probation)[.]"

61.     On May 11, 2017, in accordance with UPMC GME policies, Dr. Kling filed a grievance with UPMC Department of Plastic Surgery appealing his probation status and discrimination.

62.     In response to this appeal, Dr. Kling and Dr. Nguyen met on May 12, 2017. During this meeting Dr. Nguyen disparaged Dr. Kling for being open and interested in a number of different medical residency specialties and stated that he would not support Dr. Kling in pursuing any medical specialty that comprised even a modicum of acuity. Dr. Nguyen lectured Dr. Kling on the importance of truthfulness and acceptance regarding Dr. Kling's non-renewal, and tried to minimize the importance of the lack of documentation surrounding Dr. Kling's alleged probation status. Additionally, Dr. Nguyen threatened Dr. Kling against creating an adversarial relationship with the defendants because it would plague him for decades to come.

63.     Because the appeal with the UPMC Department of Plastic Surgery was unsuccessful, on May 23, 2017, Dr. Kling filed an appeal with UPMC GME, in accordance with the relevant UPMC GME policy, regarding the probation status and discrimination.

64.     Following Dr. Kling's appeal to UPMC GME, on May 24, 2017, an abrupt meeting was scheduled between Dr. Kling, Dr. Nguyen, and Dr. Losee. Dr. Kling's wife was also present for the meeting. During this meeting Dr. Kling was notified that UPMC GME determined that Dr. Kling was never put on probation and all such mentions must be removed from his record. Nonetheless, Dr. Losee minimized the importance of this ruling and continued to threaten Dr. Kling during this meeting. For example, Dr. Losee stated "I could put you on probation today." Dr. Kling was presented with a final letter to the PABM that did not mention probation ("PABM Letter #3"), and was notified that this letter would be mailed to PABM the next day. Additionally, Dr. Kling was removed from the workplace and placed on administrative

leave. Dr. Losee explained that Dr. Kling was placed on administrative leave because according to UPMC GME attorneys it would minimize the UPMC Entities' legal exposure.

65.     Dr. Kling requested a copy of PABM Letter #3 for his records, but was told he could not receive a copy via email and he would only be allowed to review it in person, even though previous versions had been emailed to him. Dr. Kling reviewed the letter during the May 24, 2017 meeting and permitted UPMC to send it to PABM. Dr. Kling ultimately received his unrestricted medical license in Pennsylvania on June 14, 2017.

66.     Thereafter, Defendants retaliated against Dr. Kling for engaging in the protected activity of appealing his probation status and discrimination.

67.     For example, on or about March 10, 2017, Dr. Kling requested reimbursement for a Drug Enforcement Agency ("DEA") registration number application with UPMC Department of Plastic Surgery. The reimbursement amount totaled $731. Dr. Kling received a confirmation email from the UPMC Entities that the DEA reimbursement was being processed. However, to this day Dr. Kling has not received the reimbursement.

68.     Additionally, on or about June 5, 2017, Dr. Kling requested access to his academic evaluations from his three years of training at UPMC. After emailing back and forth with the Residency Coordinator in the Department of Plastic Surgery for many weeks, Dr. Nguyen eventually replied by email on June 20, 2017 that "the office is in the midst of collating these." Dr. Kling was finally allowed access to his academic records on or about June 29, 2017, but only after notifying UPMC GME of the delay. Upon information and belief, the defendants tampered with Dr. Kling's evaluations,

**B.     Defendants' Interference with Plaintiff's Job Prospects**

15

69.     Shortly after Dr. Kling's contract was not renewed at UPMC in February 2017, Dr. Kling began to seek new employment opportunities. Dr. Kling ultimately applied to more than two hundred positions costing tens of thousands of dollars in application fees and travel expenses.

70.     Based upon information and belief, Dr. Nguyen communicated the undocumented probation and other private medical information to individuals inside and outside of UPMC causing harm in the denial of educational and employment opportunities.

71.     In April 2017, Dr. Kling applied for a research fellowship in the UPMC Department of Dermatology ("Dermatology Position"). The position was a one-year non-clinical position. Dr. Kling met with several of the UPMC Department of Dermatology faculty members, including Melissa Pugliano-Mauro, M.D. ("Dr. Pugliano-Mauro"), UPMC Department of Dermatology Residency Program Director.

72.     On April 18, 2017, Oleg E. Akilov, MD, Ph.D. ("Dr. Akilov"), Assistant Professor of Dermatology at UPMC, confirmed that the fellowship was still available for Dr. Kling if he wanted it. Dr. Kling asked Dr. Rubin to contact the chairman of the Department of Dermatology on his behalf. Dr. Rubin agreed to perform Dr. Kling's request.

73.     On April 21, 2017, Dr. Kling emailed Dr. Rubin to follow up regarding this request. Dr. Rubin responded that he had tried to reach the chairman but had not been able to connect with him, and that he would continue to pursue.

74.     That same day, Dr. Akilov emailed Dr. Kling stating that the chairman told him there was no longer funding for the fellowship position.

75.     During the meeting between Dr. Kling and Dr. Nguyen on May 12, 2017, it was revealed that Dr. Nguyen had interfered with the Dermatology Position by misrepresenting Dr. Kling's qualifications to Dr. Pugliano-Mauro.

76.     Based upon information and belief, UPMC Entities through their agents have and continue to interfere with educational and employment opportunities outside of UPMC as well, including, but not limited to: AllMed Medical & Rehabilitation Centers ("AllMed"), Yale Internal Medicine Residency Training program at Greenwich Hospital ("Greenwich"), Denver Health Emergency Medicine Residency Training program, and Harvard South Shore Psychiatry Residency Training Program.

77.     Dr. Kling applied for the position of Assistant to the Executive Medical Director at AllMed. The AllMed hiring committee requested a letter from Dr. Kling's residency program director, with the deadline for the letter on May 26, 2017.

78.     On May 26, 2017, Dr. Kling emailed Dr. Nguyen to confirm that he sent a letter of reference to AllMed. Dr. Nguyen stated that he did not send a letter, and instead tried to call AllMed at least twice and left a voicemail because "we thought it best to call them directly."

79.     After Dr. Kling reminded Dr. Nguyen that AllMed requested a letter, not a phone call, Dr. Nguyen lied and said, "their letter did not indicate that they required a written response. Let us know how you'd like to proceed." Dr. Kling reiterated that AllMed required a letter. Dr. Nguyen finally mailed a letter to AllMed after the deadline. Dr. Kling received a rejection letter from AllMed dated July 3, 2017.

80.     On or about September 25, 2017, Dr. Kling was notified of an advanced PGY-1 position at Greenwich. Charles Seelig, M.D. ("Dr. Seelig"), Greenwich Internal Medicine Residency Program Director, told Dr. Kling over the phone that he was their top candidate. Dr.

Seelig requested a phone call with Dr. Rubin, who wrote a letter of recommendation for Dr. Kling for the position. Dr. Seelig explained his reason for the phone call was because he needed to do his due diligence.

81.     On September 29, 2017, Dr. Seelig emailed Dr. Kling an update stating that he had contacted Dr. Rubin's office, but was told that Dr. Kling would have to sign a release in order for this phone call to move forward. Initially, Dr. Seelig was told that this process would be facilitated by Kristen Lasher, UPMC GME Director, GME Compliance & Institutional Certification. Dr. Seelig assured Dr. Kling that the phone call was purely routine and not because he was concerned about Dr. Kling's qualifications.

82.     On October 2, 2017, Dr. Kling emailed Dr. Rubin and Dr. Seelig a signed letter authorizing Dr. Rubin to communicate with Dr. Seelig.

83.     In early October 2017, Dr. Kling spoke with Anna Roman PhD.., ("Dr. Roman"), Vice President of UPMC GME, regarding the Greenwich position. Dr. Roman explained that Dr. Rubin would not be discussing anything over the phone; instead, Dr. Seelig would have to email written questions to Dr. Rubin.

84.     Dr. Kling updated Dr. Seelig regarding the new restrictions and provided Dr. Seelig with Dr. Roman's contact information. Dr. Seelig told Dr. Kling that written questions were "atypical" in response to his request for a brief phone call.

85.     Following this conversation, Dr. Seelig spoke with Dr. Roman. On or about October 3, 2017, Dr. Seelig emailed Dr. Kling stating that it was no longer necessary for him to send written questions to Dr. Rubin because "I don't feel there is a point because he has said, in writing, what his evaluation of you is and I am sure this will not change." However, Dr. Kling

could tell that Dr. Seelig had become skeptical due to the circus the UPMC Entities had created over a brief phone call with Dr. Rubin.

86.     On October 7, 2017, Dr. Nguyen inserted himself into the mayhem by emailing Dr. Kling an authorization to communicate and release of liability form for Dr. Kling to sign. Upon information and belief, no other resident in the UPMC Department of Plastic Surgery at that time was asked to sign such a release. Dr. Kling refused to sign the release because it would grant broad authorization for the UPMC Entities and their agents to disseminate their discriminatory and unfounded opinions about Dr. Kling with impunity.

87.     Ultimately Dr. Kling was not hired for the Greenwich position.

88.     The UPMC Entities and individual defendants also tried to dissuade Dr. Kling from pursuing another residency position and a career in clinical medicine altogether.

89.     From February 2017 to January 2018, Ernest Manders, M.D. ("Dr. Manders"), Professor of Plastic Surgery at UPMC, harassed Dr. Kling with phone calls, emails, and texts asking what he was up to and attempting to dissuade Dr. Kling from a future career in medicine by suggesting he consider an MBA, JD or other advanced degree. Upon information and belief, Dr. Manders was directed to incessantly contact Dr. Kling by Dr. Nguyen and/or Dr. Losee.

90.     In addition, Dr. Nguyen's opinion of Dr. Kling continued to get progressively worse.  In a letter dated September 7, 2017, Dr. Nguyen wrote that Dr. Kling does not have the capability to act in any capacity of any type of physician, let alone a plastic surgeon." In addition, he wrote, "…It was felt that the best way of supporting Russell would be to strongly advise against him not to pursue further training in a clinical field of medicine. Russell's strengths do not seem to lie in the clinical care of patients." This letter contradicts Dr. Nguyen's previous opinion about Dr. Kling, as he recommended Dr. Kling for his unrestricted

Pennsylvania medical license, and also contradicts Dr. Rubin's letter of recommendation that was sent to hundreds of residency programs.

91.     Based upon the above, UPMC and related entities including the individuals identified through aiding and abetting have violated the Americans With Disabilities Act, as amended, Rehabilitation Act and Pennsylvania Human Relations Act including termination through the non-renewal of the residency contract, failure to provide reasonable accommodations, improper medical inquiries, breach of confidentiality provisions, and retaliation.

92.     Under the ADAAA, Rehabilitation Act and PHRA, Dr. Kling has a disability as defined by statute to include an actual disability and was regarded as and/or a record of disability based upon the neuropsychological examination that the defendants required as part of the accommodation process.

93.     As a result, of this conduct, Dr. Kling has suffered harm and seeks all available remedies under state and federal law including back pay, front pay, compensatory damages, punitive damages, interest, attorney fees, costs, interest and equitable relief.

94.     Dr. Kling has exhausted administrative remedies as evidenced by the issuance of a Right to Sue letter from the Equal Employment Opportunity Commission dated September 19, 2018. Plaintiff's claims under the Rehabilitation Act do not require administrative exhaustion.

**COUNT I:**
**Termination from Plastic Surgery Residency Program:**
**Allegations of Defendant's Violations of the Americans With Disabilities Act,**
**<u>Rehabilitation Act and Pennsylvania Human Relations Act</u>**

95.     Dr. Kling incorporates by reference all of the above allegations set forth in this Complaint.

96.    Dr. Kling was at all relevant times capable of performing the essential functions of a resident in plastic surgery with or without accommodations.

97.    Dr. Kling was not allowed to return to work, because Dr. Kling was disabled, regarded as disabled and/or had a record of disability within the meaning of the Americans With Disabilities Act, Rehabilitation Act, and Pennsylvania Human Relations Act.

98.    As a result of this conduct, defendants have caused Dr. Kling the loss of wages and other job benefits and emotional and other harm including punitive damages.

**COUNT II:**
**Denial of Reasonable Accommodations in the Plastic Surgery Residency Program:**
**Allegations of Defendants' Violation of the Americans With Disabilities Act,**
**Rehabilitation Act and Pennsylvania Human Relations Act**

99.    Dr. Kling incorporates by reference all of the above allegations set forth in this Complaint.

100.    Dr. Kling was at all relevant times capable of performing the essential functions of a resident in the plastic surgery department with or without accommodations. To the extent that defendants maintain that Plaintiff would not have successfully completed a remedial year, defendants failed to provide a reasonable accommodation similar to remedial years being provided to other residents.

101.    Dr. Kling was not allowed to return to work, because Dr. Kling was disabled, regarded as disabled, and/or had a record of disability within the meaning of the American with Disabilities Act, Rehabilitation Act, and Pennsylvania Human Relations Act with or without accommodations.

102.    As a result of this conduct, defendants have caused Dr. Kling the loss of wages and other job benefits and emotional and other harm and punitive damages.

**COUNT III:**
**Denial of Reasonable Accommodations in Failure to Provide Non-Competitive**
**Reassignment: Allegations of Defendants' Violation of the Americans With Disabilities Act,**
**Rehabilitation Act and Pennsylvania Human Relations Act**

103.     Dr. Kling incorporates by reference all of the above allegations set forth in this Complaint.

104.     Dr. Kling was at all relevant times capable of performing the essential functions of a resident in the plastic surgery department with or without accommodations. Dr. Kling identified and requested transfer or reassignment to other vacant and funded job opportunities to which he was qualified.

105.     Dr. Kling was denied such job opportunities because Dr. Kling was disabled, regarded as disabled, and/or had a record of disability within the meaning of the American with Disabilities Act, Rehabilitation Act, and Pennsylvania Human Relations Act with or without accommodations.

106.     As a result of this conduct, defendants have caused Dr. Kling the loss of wages and other job benefits and emotional and other harm and punitive damages.

**COUNT IV:**
**Medical Inquiry: Defendants' Violation of the ADAAA and Rehabilitation Act**

107.     Dr. Kling incorporates by reference all of the above allegations set forth in this Complaint.

108.     Section 102(d) of the ADA provides, in relevant part, as follows:

(d)     Medical examinations and inquiries.

(1)     In general. The prohibition against discrimination as referred to in subsection (a) shall include medical examinations and inquiries.

(2)     Preemployment.

(A)    Prohibited examination or inquiry. Except as provided in paragraph (3), a covered entity shall not conduct a medical examination or make inquiries of a job applicant as to whether such applicant is an individual with a disability or as to the nature or severity of such disability.

(B)    Acceptable inquiry. A covered entity may make preemployment inquiries into the ability of an applicant to perform job-related functions.

(3)    Employment entrance examination. A covered entity may require a medical examination after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant, and may condition an offer of employment on the results of such examination, if-

(A)    all entering employees are subjected to such an examination regardless of disability;

(B)    information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record, except that-

(i)    supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;

(ii)    first aid and safety personnel may be informed, when appropriate, if the disability might require emergency treatment; and

(iii)    government officials investigating compliance with this Act shall be provided relevant information on request; and

(C)    the results of such examination are used only in accordance with this title.

(4)    Examination and inquiry.

(A)    Prohibited examinations and inquiries. A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the

nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

(B)     Acceptable examinations and inquiries. A covered entity may conduct voluntary medical examinations, including voluntary medical histories, which are part of an employee health program available to employees at that work site. A covered entity may make inquiries into the ability of an employee to perform job-related functions.

(C)     Requirement. Information obtained under subparagraph (B) regarding the medical condition or history of any employee are subject to the requirements of subparagraphs (B) and (C) of paragraph (3).

109.    Pursuant to Section 102(d), medical examinations and inquiries are regulated to a varying extent depending upon <u>when</u> the information is sought by the employer.  With respect to job applicants who have not received an offer, subsection (d)(2) provides that an employer may only make pre-employment inquiries of an applicant's ability "to perform job-related functions" but not into whether the applicant is disabled.

110.    Under subsection (d)(3), which applies to an applicant who has received an offer of employment but who has not yet started work, the employer may require a medical examination and make an offer of employment conditional on the results of such examination so long as (1) all employees are subject to such inquiry; (2) information obtained is maintained on separate forms and in separate files and treated as confidential; (3) the results of the examination are "only used in accordance with this subchapter."  Regarding the third requirement that the results are "only used in accordance with this subchapter," this means "as long as the employer does not discriminate on the basis of the applicant's disability."

111.    Finally, under subsection (d)(4), which applies to current employees, the employer may not inquire into whether an employee suffers from a disability unless any such examination is "job-related and consistent with business necessity."  Notably, examinations and

24

inquiries under subsection (d)(4) are also subject to the requirement that such information be "only used in accordance" with the ADA.

112.    Dr. Kling was required by defendants to submit decades old medical records, neuropsychological testing, undergo drug and alcohol testing, and psychiatric and medical evaluation.

113.    Dr. Kling complied with all such requests to the best of his ability. However, defendants misinterpreted and selectively disseminated the results in a discriminatory and retaliatory manner.

114.    Defendants' conduct as described in this Complaint constitutes discrimination on the basis of disability in violation of the ADAAA and Rehabilitation Act and its implementing regulations in the following ways:

> (a)    by requiring Dr. Kling to submit to medical examinations and disability-related inquiries prior to and after a job offer, that are not job-related and consistent with business necessity and are unrelated to their ability to perform his job-related functions, 42 U.S.C. Section 12112(d)(2) and 29 C.F.R. Section 1630.13; and

> 97.    by requiring Dr. Kling to disclose overbroad medical history and/or medical records (including information wholly unrelated to the medical issues for which Defendant was purportedly evaluating the applicant's fitness for duty), 42 U.S.C. Section 12112(d)(3) and 29 C.F.R. Section 1630.14(b).

115.    As a result of this conduct, defendants have violated the ADAAA and Rehabilitation Act and caused Dr. Kling the loss of wages and other job benefits and emotional and other harm.

## COUNT V:
## Disclosure of an Employee's Handicap or Disability under PHRA (16 Pa. Code § 44.12)

116.    Dr. Kling incorporates by reference all of the above allegations set forth in this Complaint.

117.     The PHRA places restrictions upon the use of medical information concerning employment. Specifically, "Information concerning a handicap or disability, medical condition or medical history of an employee, whether past, present or recurring, shall be accorded confidentiality as medical records and shall be retained only through the use of forms accorded confidentiality as medical records.

118.     Such confidential records "may only be disseminated with the permission of the employee or when the employer can show a demonstrable business necessity for the dissemination" subject limited to exceptions not applicable in the present case.

119.     Dr. Nguyen, individually and within the scope of his employment, and other agents of the UPMC Entities, disclosed confidential information including but not limited to the neuropsychological testing and results.

**COUNT VI:**
**Retaliation Under ADAAA, Rehabilitation Act and PHRA**

120.     Plaintiff incorporates herein by reference the previous allegations of this Complaint.

121.     After requesting reasonable accommodations and filing a grievance concerning the same, UPMC Entities and individual defendants retaliated against Dr. Kling including but not limited to sharing confidential information, delaying his medical license, misappropriating funding, requiring him to release and waive rights in order to provide references, delaying access to employee records, not reimbursing for DEA licensure, and providing inaccurate references both internally and externally including being placed on probation. As a result, Dr. Kling was refused internal job opportunities and external job opportunities.

122.     The above conduct by defendants constitutes retaliation in violation of the American With Disabilities Act as amended, Rehabilitation Act and PHRA based upon Plaintiff's complaints of discrimination including his requests to return to work.

## COUNT VII:
## Tortious Interference With Prospective Contract

123.     Plaintiff incorporates herein by reference the previous allegations of this Complaint.

124.     Dr. Kling applied for and was considered for employment establishing prospective contractual relations including those in paragraphs 69 through 87.

125.     Defendants knew that Dr. Kling needed letters of recommendation from them in order for him to obtain new employment in a medical field.

126.     Defendants acted with wrongful purpose by interfering with Dr. Kling's prospective contractual relations by writing untruthful and discriminatory letters to prospective employers and/or failing to timely respond to prospective employers' inquiries.

127.     Dr. Nguyen, individually and as an agent of UPMC Entities, and other agents of UPMC Entities purposefully intended harm and to prevent such prospective relations from occurring through the dissemination of false information causing lost opportunities, financial and reputational harm.

128.     Plaintiff is entitled to punitive damages because Defendants' conduct was malicious, wanton, willful, and oppressive toward Plaintiff, and/or exhibited a reckless indifference to the rights of Plaintiff.

## PRAYER FOR RELIEF (All Counts)

1.     WHEREFORE, Dr. Kling demands: (1) judgment against defendants jointly and severally in an amount to make him whole for all damages suffered by him as a result of

defendants' violation of the Americans with Disabilities Act, Rehabilitation Act and Pennsylvania Human Relations Act, including, but not limited to, damages for back pay and benefits, front pay, compensatory damages, and all other damages recoverable under the above laws plus prejudgment, offset for tax consequences and other interest; (2) Plaintiff is entitled to punitive damages on those claims other than the Rehabilitation Act and PHRA because Defendants' conduct was malicious, wanton, willful, and oppressive toward Plaintiff, and/or exhibited a reckless indifference to the rights of Plaintiff; (3) that this Court enjoin defendants from further violating the above laws; (4) expunge all records based upon defendants' discriminatory and retaliatory acts; (5) that this Court order defendants to reinstate Dr. Kling to the position he sought when defendants unlawfully disqualified him with all seniority and benefits he would have otherwise accrued had not defendants violated the above laws; (6) that this Court award Dr. Kling expert witness fees, attorneys' fees and the cost of bringing this action and, (7) that this Court grant his all other relief that he is entitled to under law and equity.

**A JURY TRIAL IS DEMANDED.**

DATED:  October 12, 2018

> Respectfully submitted,
>
> MORGAN & PAUL, PLLC
>
> /s/ Gregory G. Paul
> _____
> GREGORY G. PAUL
> PA ID 83334
> First and Market Building
> 100 First Avenue, Suite 1010
> Pittsburgh, PA 15222
> (412) 259-8375 (telephone)
> (888) 822-9421 (facsimile)
> gregpaul@morgan-paul.com
> Attorney for Plaintiff

28