## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

RUSSELL E. KLING, M.D.

      Plaintiff,

v.

UNIVERSITY OF PITTSBURGH
MEDICAL CENTER, UNIVERSITY
HEALTH CENTER OF PITTSBURGH d/b/a
UPMC MEDICAL EDUCATION and VU T.
NGUYEN, M.D.,

      Defendants

Case No. 2:18-cv-01368-CRE

Judge Cynthia R. Eddy

## AMENDED COMPLAINT

AND NOW, comes the Plaintiff, Russell E. Kling, M.D., by and through his attorneys and files the following Amended Complaint for claims under the Americans with Disabilities Act, as amended, the Rehabilitation Act, the Pennsylvania Human Relations Act, for tortious interference with prospective contract and for negligent infliction of emotional distress and alleges as follows.

## PARTIES

1.     Plaintiff, Russell E. Kling, M.D. (hereinafter referred to as "Dr. Kling" or "Plaintiff") is an adult individual, residing in Pittsburgh, Pennsylvania (Allegheny County).

2.     The Defendants, University of Pittsburgh Medical Center ("UPMC") and University Health Center of Pittsburgh, ("GME") (collectively referred to as "UPMC Entities") are non-profit corporations with their principal place of business located in Pittsburgh, Pennsylvania.

3.     Vu T. Nguyen, M.D. (hereinafter referred to as "Dr. Nguyen") is an adult individual, residing in Pittsburgh, Pennsylvania (Allegheny County).

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves claims made under the Americans With Disabilities Act, and ("ADAAA"), 42 U.S.C. §§12101, et. seq., Section 504 of the Rehabilitation Act of 1973, as amended, ("Rehabilitation Act"), 29 U.S.C. §794 et. seq., both federal statutes.

5.      As to claims under the Pennsylvania Human Relations Act, as amended ("PHRA"), PA. STAT. ANN. Title 43 §§951 et. seq., and common law of Pennsylvania, this Court has supplemental subject matter jurisdiction pursuant to 28 U.S.C. § 1367.

6.       Venue is proper in this District under 28 U.S.C. § 1391 (b) and (c) because a substantial part of the acts or omissions giving rise to this action occurred in this District and Defendants are subject to personal jurisdiction in this District.

## NATURE OF THE CLAIMS

7.      Plaintiff seeks declaratory, injunctive and compensatory and punitive relief for denial of employment on the basis of disability, regarded as, record of disability as defined by the applicable statutes and/or denial of a reasonable accommodation, improper medical inquiries and retaliation by the UPMC Entities.

8.      Plaintiff also seeks to recover monetary damages for tortious interference with prospective contract and negligent infliction of emotional distress.

## PRELIMINARY STATEMENT

9.      The UPMC Entities are covered employers within the meaning of the Rehabilitation Act and ADA because, among other things, they employed the requisite number of employees during the relevant times.

10.     Dr. Kling was denied employment because of his disability, or was regarded as disabled, based on a perception that he was substantially limited in one or more major life activities and/or

was regarded as disabled or record of disability by defendants that this disability prevented him from performing the job held or desired and was refused an accommodation for this medical condition. At all times relevant to this lawsuit, Dr. Kling was a qualified individual with a disability who possessed the requisite qualifications to perform the essential functions of a resident, with or without an accommodation.

11.     At all relevant times, the UPMC Entities received federal financial assistance, thereby rendering Section 504 of the Rehabilitation Act applicable to its employment programs and activities.

## STATEMENT OF MATERIAL FACTS

12.     Dr. Kling was paid as a resident physician in the Department of Plastic Surgery at GME from July 1, 2014, until June 30, 2017.

13.     Following disclosure of a learning disability and a request for reasonable accommodation Kling was told to submit for a drug and alcohol test, placed on administrative leave, terminated due to contract non-renewal, and retaliated against through false statements and disclosure of medical information resulting in the denial of educational and employment opportunities internally at GME and externally.

**Background**

14.     In August 2011, Dr. Kling took a voluntary leave of absence from medical school and moved from Boston, Massachusetts, to Pittsburgh, Pennsylvania, to work as an unpaid research fellow at the UPMC Department of Plastic Surgery's Adipose Stem Cell Center under the direction of J. Peter Rubin, M.D. ("Dr. Rubin"), Chairman of UPMC Department of Plastic Surgery.

15.     Dr. Kling volunteered full-time at the Adipose Stem Cell Center from August 2011 through August 2013, publishing a number of peer reviewed articles and giving presentations at various plastic surgery meetings as a representative of UPMC.

16.     During his fourth year of medical school, Dr. Kling matched at UPMC in the Department of Plastic Surgery's six-year integrated residency program. Dr. Kling began his employment at UPMC as a post-graduate year 1 ("PGY-1") resident on July 1, 2014.

17.     After successfully completing PGY-1 in plastic surgery at GME, Dr. Kling was promoted to post-graduate year 2 ("PGY-2") and his annual contract was renewed.

18.     After completing PGY-2 in plastic surgery, Dr. Kling began his post-graduate year 3 ("PGY-3") on July 1, 2016 without an executed annual reappointment contract.

19.     On or about July 6, 2016, Dr. Kling met with Dr. Nguyen, newly appointed Residency Program Director of GME Department of Plastic Surgery, and Joseph E. Losee, M.D. ("Dr. Losee"), Executive Vice Chair of GME Department of Plastic Surgery, for his annual residency review meeting to discuss his PGY-2 evaluations. Dr. Kling was informed that he would be promoted to PGY-3, as was recommended by approximately 95% of the evaluating faculty members.

20.     During his two research years, PGY-1, and PGY-2, Dr. Kling published thirteen peer reviewed articles, published a book chapter in a plastic surgery textbook, gave more than twenty-nine presentations at various plastic surgery conferences, including the prestigious American Association of Plastic Surgery meeting in 2015 where he was one of few GME Plastic Surgery residents to be accepted. In addition, Dr. Kling was asked to be a member on the esteemed American Society of Plastic Surgeons' Legislative Advocacy Committee.

21.    As a PGY-1, Dr. Kling scored in the 55th percentile among his peers on the national plastic surgery in-service training examination. As a PGY-2, Dr. Kling scored in the 54th percentile on this same exam.

22.    Dr. Kling was not allowed to take the plastic surgery in-service examination as a PGY-3.

**Discrimination During PGY-3**

23.    At the end of June 2016, it was announced that Dr. Nguyen would become the new Residency Program Director of GME Department of Plastic Surgery, a position previously held by Dr. Losee.

24.    Dr. Kling's first rotation of PGY-3 training was at UPMC Magee-Women's Hospital, where he worked extensively under the guidance of Dr. Nguyen.

25.    On or about August 10, 2016, Dr. Nguyen initiated a meeting with himself, Dr. Kling, Dr. Losee, and William D. Tobler, Jr., M.D. ("Dr. Tobler"), Administrative Chief Resident of UPMC Department of Plastic Surgery, to discuss his concerns regarding Dr. Kling's technical performance and alleged lack of medical knowledge.

26.    At this meeting, defendants failed to adhere to GME rules, regulations and protocols for the implementation of an "individualized educational plan" and remediation, which was intended to help in improving Dr. Kling's performance.

27.    As part of this plan, Dr. Kling was required him to meet with one or two co-residents, including Dr. Tobler, and some faculty members to discuss plastic surgery topics for one to two hours per week.

28.    In addition, Dr. Kling was required to reach out to UPMC's Resident and Fellow Assistance Program ("RFAP") for confidential counseling under the supervision of Cliff Cohen ("Cohen"), Clinical Director of RFAP.

29.     Dr. Kling was told that the defendants would make any and all necessary resources available to him because the department was committed to his success. However, Dr. Kling was also warned that if his performance did not improve, he might have to repeat PGY-3 clinical training.

30.     Dr. Kling was not notified that he would likely be placed on academic Probation.

31.     On or about September 8, 2016, Dr. Kling's PGY-3 reappointment contract with UPMC was finalized. The reappointment agreement was in effect from July 1, 2016 to June 30, 2017.

32.     On or about September 14, 2016, Dr. Nguyen requested another meeting with himself, Dr. Kling, Dr. Losee, and Dr. Tobler to discuss further concerns about Dr. Kling's performance. During the meeting, Dr. Kling was probed about possible substance abuse and/or personal issues, which he denied.

33.     Again, Dr. Kling was told that the defendants would make any and all necessary resources available to him because they were committed to his success.

34.     Dr. Kling was warned again that if his performance did not improve, he might have to repeat PGY-3 clinical training.

35.     Dr. Kling was not notified that if lack of significant improvement in performance did occur, he would be placed on academic Probation with the possibility of not progressing the following clinical year.

36.     In early October 2016, Dr. Kling gave a presentation at a weekly conference and accidentally included a slide from the prior week's presentation. That night, Dr. Kling received a call from Dr. Nguyen to discuss this small mistake, which was characterized by Dr. Nguyen as "gross negligence" and as being a lack of detail that could, in the clinical setting, result in subsequent patient morbidity and/or mortality.

37.    On the morning of October 10, 2016, after Dr. Kling had operated with Dr. Nguyen, Dr. Nguyen demanded to speak with Dr. Kling's wife. Dr. Kling called his wife and urged her to call Dr. Nguyen. During the phone call, Dr. Nguyen asked Dr. Kling's wife numerous personal and probing questions, including questions related to possible drug and/or alcohol abuse.

38.    That same day, Dr. Kling met with Dr. Nguyen and Dr. Rubin. During this meeting Dr. Kling disclosed that he has a learning disability and presented a written letter explaining the disability.

39.    No changes were implemented to Dr. Kling's "individualized educational plan" despite the disclosure. During this meeting, Dr. Kling was instructed to schedule appointments with a primary care physician and a psychiatrist to initiate medical evaluations.

40.    Dr. Kling was again informed that the defendants would make any and all necessary resources available to him because they were committed to his success. However, Dr. Kling was informed for the first time that if his performance did not improve, he might not complete the residency program.

41.    It was later revealed in the minutes of this meeting that Dr. Nguyen was actively investigating Dr. Kling's progress at RFAP by demanding Cohen update him on all matters related to Dr. Kling, including Dr. Kling's learning disability, despite the fact that Dr. Kling signed a confidentiality agreement with RFAP explicitly prohibiting such disclosures.

42.    Upon information and belief, Dr. Nguyen also attempted to contact the psychiatrist at UPMC who evaluated Dr. Kling, in order to obtain medical information.

43.    Dr. Nguyen gave Dr. Kling his minutes from their meetings on September 14,2016, and October 10, 2016, and requested that Dr. Kling sign these meeting minutes. Dr. Kling refused to sign the meeting minutes, as the documents were replete with factual errors and

mischaracterizations. Instead, Dr. Kling wrote and signed an addendum to attach to the meeting minutes pointing out the errors and mischaracterizations.

44.     Throughout the remainder of 2016, Dr. Kling continued to work hard and improve his performance. Indeed, on December 2, 2016, Dr. Nguyen noted in an email to Dr. Kling "I hope and hear things are improving."

45.     As part of the semi-annual review process for residents, the GME Department of Plastic Surgery Clinical Competency Committee ("CCC") meets each year in December and June to review each resident's performance. Dr. Kling was informed that on December 21, 2016 the CCC would be deciding whether he would be placed on probation and whether he would have to repeat PGY-3 clinical training.

46.     On December 16, 2016, Dr. Kling met with Dr. Nguyen and Dr. Losee for his semi-annual residency review. During this meeting Dr. Kling was told to submit documentation to support his learning disability diagnosis. Dr. Kling was also told that the CCC would not be making any decisions about him until the documentation could be reviewed.

47.     There are no meeting minutes from the semi-annual residency review meeting.

48.     On December 20, 2016, Dr. Kling sent an email to GME Department of Plastic Surgery submitting a request for accommodations related to a learning disability that would permit a remedial year.

49.     Upon information and belief, remedial years have been provided to other resident physicians in the GME Department of Plastic Surgery and in other GME residency programs.

50.     In response to Dr. Kling's request, Dr. Losee requested official documentation from the psychologist/psychiatrist who evaluated and diagnosed Dr. Kling.

51.     On or about January 6, 2017, Dr. Kling submitted to the defendants accessible

documentation from his prior accommodation request for the MCAT (Medical College Admission Test). That same day, Dr. Nguyen requested a neuropsychological examination ("Neuropsych Exam") of Dr. Kling to be administered by UPMC.

52.     The Neuropsych Exam was organized by Cohen and administered by Sue Beers, Ph.D. ("Dr. Beers"), Professor of Psychiatry at the University of Pittsburgh. The testing was Conducted over the course of three days in January of 2017.

53.     Dr. Kling received the results of the Neuropsych Exam via email from Dr. Nguyen on February 9, 2017, which confirmed that he has a learning disability.

54.     The neuropsychological report stated that Dr. Kling "may find a remedial year of highly focused accommodation and interventions will provide adequate learning support to succeed in his chosen medical specialty" or in the alternative he "may benefit from receiving mentorship with the goal of collaboratively reassessing his area of medical specialty or reconsideration of his overall career path."

55.     No one in the GME Department of Plastic Surgery reached out to meet with Dr. Kling to discuss the ramifications of the Neuropsych Exam.

56.     Instead, on or about February 20,2017, the CCC met to discuss Dr. Kling's performance and future in the residency program.

57.     On February 24, 2017, Dr. Kling met with Dr. Nguyen and Dr. Losee, who informed him that his annual contract would not be renewed because the Neuropsych Exam "demonstrates a learning disorder and lack of visual-spatial skills that make you ill-equipped for training in our specialty."

58.     Rather than providing an accommodation through the interactive process for Dr. Kling in his existing position in plastic surgery (by allowing a remedial year) or by transferring him to

another specialty (as a reassignment accommodation), the UPMC Entities terminated his

employment by not renewing his contract beyond June 30, 2017.

59.     Moments after being told that his contract would not be renewed on February 24,2017,

Dr. Kling was required to submit for drug and alcohol testing despite the lack of any reasonable

cause or employment necessity.

60.     Despite refusing to renew his contract beyond June 30, 2017, and placing Dr. Kling on

administrative leave on May 24, 2017, from February 24, 2017 until May 24, 2017, Dr. Kling

continued to work as a PGY-3 plastic surgery resident, operating on patients daily under direct

and indirect supervision of GME plastic surgery faculty.

61.     Based upon information and belief, GME and related entities failed to follow and then

conspired to change human resource policies in order to cover up its discriminatory and

retaliatory conduct.

62.     During this time, Dr. Kling started seeing Susan Oerkvitz, Ph.D., a psychologist at RFAP,

to deal with his emotional distress and mental anguish resulting from Defendants' hostile and

retaliatory conduct, including GME's non-renewal of his contract.

63.     Inconsistent with the Neuropsych Exam's alternative recommendation for collaborative

reassessment of a medical specialty, UPMC Entities and Dr. Nguyen failed to engage in the

interactive process of reassignment of Dr. Kling.

64.     On or about March 10, 2017, Dr. Kling met with Dr. Losee, who assured Dr. Kling that

the defendants would support him in future employment opportunities but did not offer any

advice or guidance. Dr. Losee emphasized the importance of Dr. Kling keeping the department

updated on all of Dr. Kling's future career plans.

65.      In March 2017, Dr. Kling contacted the UPMC GME office to request his available

funding and available positions.

66.     On March 30, 2017, Samantha Cascone, Director of GME Operations, informed Dr. Kling that "we do not have any positions that you would be eligible for in our system" and that he had two years of residency funding left.

67.     Dr. Kling inquired further into his funding because he should have had three years left of funding, as plastic surgery is a six-year residency program and he was only in his third year of training. He was never given an explanation for the missing year of funding.

68.     On June 30, 2017, Dr. Kling's last day as an employee at GME, Dr. Nguyen emailed Dr. Kling a self-serving letter denying retaliation against Dr. Kling and stating "I hope someday you will come to appreciate that all of us, particularly me, but also Dr. Losee, Dr.Rubin and the faculty have from the very beginning been supportive of you, as we are of all residents."

69.     On or about August 22, 2017, Dr. Kling submitted a charge with the Equal Employment Office Commission ("EEOC") for disability discrimination and retaliation.

**Defendants' Retaliation Against Plaintiff**

70.     After his termination, in order for Dr. Kling to be able to practice medicine and/or obtain new medical employment opportunities, he needed letters of recommendation from the defendants to verify his residency education and assure prospective employers that there were no global issues. Instead, the defendants retaliated against Dr. Kling, delaying essential information, letters and maligning his character.

### A.     Defendants Fabricated Plaintiff's Probation Status

71.     On or about March 22, 2017, Dr. Kling asked Dr. Nguyen to write a letter to the Pennsylvania Board of Medicine ("PABM") to verify his residency education, as required to complete his unrestricted medical license application in Pennsylvania.

72.     On or about April 14, 2017, Dr. Nguyen sent Dr. Kling a draft of his letter to the PABM ("PABM Letter #1").

73.     PABM Letter #1 was littered with errors, including wrong dates, misspelling of Dr.

Kling's name, and the erroneous assertion that Dr. Kling was on probation.

74.     PABM Letter #1 was the first time Dr. Kling learned of his probation status, and the first

time this alleged probation status was documented.

75.      Relevant GME policies require that residents be notified in writing of adverse actions

such as probation.

76.     Upon information and belief, every medical resident at the GME who has not had his or

her annual contract renewed has been placed on probation at least once, before the decision was

made to not be renewed.

77.     PABM Letter #1 also stated that there were no "global concerns raised regarding [Dr.

Kling's] work ethic and professionalism."

78.     On April 20, 2017, Dr. Kling emailed Dr. Nguyen an edited version of PABM Letter #1

and advised that he was never on probation.

79.     Thereafter, Dr. Nguyen pressured Dr. Kling into accepting his version of the facts

regarding probation. For example, on April 27, 2017, Dr. Nguyen sent Dr. Kling an email

"recommending" that Dr. Kling accept Dr. Nguyen's version of the facts. Otherwise, Dr. Nguyen

wrote, "I fear that this and other related issues may only continue to plague you in the future."

80.     Because Dr. Kling refused to accept that he had been put on probation without any notice

or documentation, Dr. Nguyen tried to cover up the lack of documentation by fabricating a

probation status for Dr. Kling in a letter dated April 26, 2017, that ostensibly summarized the

events that occurred between December 2016 and February 24, 2017.

81.     Dr. Nguyen requested that Dr. Kling sign this retroactive documentation stating that he

was put on probation during his semi-annual review on December 16, 2016, despite the fact that

there are no minutes from this meeting and GME policies require that residents be notified in writing of adverse actions such as probation.

82.     Dr. Kling refused to sign this letter.

83.     On May 1, 2017, Dr. Nguyen sent Dr. Kling a revised version of his letter to the PABM ("PABM Letter #2). In PABM Letter #2, Dr. Nguyen corrected the dates and spelling errors, but did not remove the assertion about probation. Additionally, the sentence regarding work ethic and professionalism had been removed.

84.     Dr. Kling refused to accept PABM Letter #2, because it continued to inaccurately misrepresent and document probation.

85.     On May 3, 2017, Dr. Nguyen emailed Dr. Kling and stated that he would not revise PABM Letter #2, as he had "been fairly accommodating in this process" by allowing Dr. Kling to correct the dates and spelling of his name in the previous version.

86.     Dr. Nguyen refused to remove reference to probation because he said it "represents the department's documentation."

87.     Dr. Nguyen further stated that he could either move forward with the current version of the letter or simply not provide a letter to PABM. Essentially, Dr. Nguyen used the letter to the PABM to blackmail Dr. Kling into accepting that he was put on probation, despite a lack of notification and/or documentation.

88.     Dr. Nguyen possessed actual or constructive knowledge that Dr. Kling could not receive his unrestricted medical license without a letter from him/GME.

89.     On May 4, 2017, Dr. Kling met with Dr. Rubin to express his concerns regarding Dr. Nguyen's interference with his unrestricted medical license and prospective employment opportunities.

90.    Dr. Rubin refused to intervene, and recommended Dr. Kling meet with Dr. Nguyen to discuss their issues.

91.    In an effort to obtain new employment, on or about May 10, 2017, Dr. Kling requested a letter of good standing from the defendants. In response, that same day, Dr. Losee emailed Dr. Kling stating that the department could not provide him with a letter of good standing because there are "simple honest facts that cannot be ignored (i.e. probation) "

92.    On May 11, 2017, in accordance with GME policies, Dr. Kling filed a grievance with the GME Department of Plastic Surgery appealing his probation status and discrimination.

93.    In response to this appeal, Dr. Kling and Dr. Nguyen met on May 12, 2017.

94.    During this meeting Dr. Nguyen disparaged Dr. Kling for being open and interested in a number of different medical residency specialties and stated that he would not support Dr. Kling in pursuing any medical specialty that comprised even a modicum of acuity.

95.    Dr. Nguyen lectured Dr. Kling on the importance of truthfulness and acceptance regarding Dr. Kling's non-renewal and tried to minimize the importance of the lack of documentation surrounding Dr. Kling's alleged probation status.

96.    Additionally, Dr. Nguyen threatened Dr. Kling against creating an adversarial relationship with the defendants because it would plague him for decades to come.

97.    Because the appeal with the UPMC Department of Plastic Surgery was unsuccessful, on May 23, 2017, Dr. Kling filed an appeal with GME, in accordance with the relevant UPMC GME policy, regarding the probation status and discrimination.

98.    Following Dr. Kling's appeal to UPMC GME, on May 24, 2017, an abrupt meeting was scheduled between Dr. Kling, Dr. Nguyen, and Dr. Losee. Dr. Kling's wife was also present for the meeting.

99.     During this meeting, Dr. Kling was notified that UPMC GME determined that Dr. Kling was never put on probation and all mentions thereof, must be removed from his record.

100.    Nonetheless, Dr. Losee minimized the importance of this ruling and continued to threaten Dr. Kling during this meeting. For example, Dr. Losee stated "I could put you on probation today."

101.    Dr. Kling was presented with a final letter to the PABM that did not mention probation ("PABM Letter #3") and was notified that this letter would be mailed to PABM the next day.

102.     On May 24, 2017, Dr. Kling was removed from the workplace and placed on administrative leave.

103.    Dr. Losee explained that Dr. Kling was placed on administrative leave, because according to UPMC GME attorneys, it would minimize the UPMC Entities' legal exposure.

104.    Dr. Kling requested a copy of PABM Letter #3 for his records, but was told he could not receive a copy via email and he would only be allowed to review it in person, even though previous versions had been emailed to him.

105.    Dr. Kling reviewed the letter during the May 24, 2017 meeting and permitted UPMC to send it to PABM.

106.     Dr. Kling ultimately received his unrestricted medical license in Pennsylvania on June 14, 2017.

107.    Defendants retaliated against Dr. Kling for engaging in the protected activity of appealing his probation status and discrimination.

108.    For example, on or about March 10, 2017, Dr. Kling requested reimbursement for a Drug Enforcement Agency ("DEA") registration number application with UPMC Department of Plastic Surgery. The reimbursement amount totaled $731. Dr. Kling received a confirmation

email from the UPMC Entities that the DEA reimbursement was being processed. However, to this day, Dr. Kling has not received the reimbursement.

109.   Additionally, on or about June 5, 2017, Dr. Kling requested access to his academic evaluations from his three years of training at GME. After emailing back and forth with the Residency Coordinator in the Department of Plastic Surgery for many weeks, Dr. Nguyen eventually replied by email on June 20, 2017 that "the office is in the midst of collating these." Dr. Kling was finally allowed access to his academic records on or about June 29, 2017, but only after notifying UPMC GME of the delay.

110.   Upon information and belief, the defendants illegally tampered with Dr. Kling's evaluations.

### B.   Defendants' Tortious Interference with Plaintiff's Job Prospects

111.   Shortly after Dr. Kling's contract was not renewed at GME in February 2017, Dr. Kling began to seek new employment opportunities. Dr. Kling ultimately applied to more than two hundred [200] positions, costing tens of thousands of dollars in application fees and travel expenses.

112.   Based upon information and belief, Dr. Nguyen communicated the undocumented probation and other private medical information to individuals inside and outside of GME, causing Dr. Kling pecuniary loss and mental anguish, proximately resulting from the denial of educational and employment opportunities.

113.   In April 2017, Dr. Kling applied for a research fellowship in the UPMC Department of Dermatology ("Dermatology Position"). The position was a one-year non-clinical position. Dr. Kling met with several of the UPMC Department of Dermatology faculty members, including Melissa Pugliano-Mauro, M.D. ("Dr. Pugliano-Mauro"), UPMC Department of Dermatology Residency Program Director.

114.    On April 18, 2017, Oleg E. Akilov, MD, Ph.D. ("Dr. Akilov"), Assistant Professor of

Dermatology at UPMC, confirmed that the fellowship was still available for Dr. Kling, if he

wanted it. Dr. Kling asked Dr. Rubin to contact the chairman of the Department of Dermatology

on his behalf. Dr. Rubin agreed to perform Dr. Kling's request.

115.    On April 21, 2017, Dr. Kling emailed Dr. Rubin to follow up, regarding this request. Dr.

Rubin responded that he had tried to reach the chairman but had not been able to connect with

him, and that he would continue to pursue.

116.    That same day, Dr. Akilov emailed Dr. Kling stating that the chairman told him there was

no longer funding for the fellowship position.

117.    During the meeting between Dr. Kling and Dr. Nguyen on May 12, 2017, it was revealed

that Dr. Nguyen had interfered with the Dermatology Position, by misrepresenting Dr. Kling's

qualifications to Dr. Pugliano-Mauro.

118.    Based upon information and belief, UPMC Entities, through their agents, have and

continue to interfere with educational and employment opportunities outside of UPMC as well,

including, but not limited to AllMed Medical & Rehabilitation Centers ("AllMed"), Yale Internal

Medicine Residency Training program at Greenwich Hospital ("Greenwich"), Denver Health

Emergency Medicine Residency Training program, and Harvard South Shore Psychiatry

Residency Training Program.

119.    Dr. Kling applied for the position of Assistant to the Executive Medical Director at

AllMed. The AllMed hiring committee requested a letter from Dr. Kling's residency program

director, with the deadline for the letter on May 26, 2017.

120.    On May 26, 2017, Dr. Kling emailed Dr. Nguyen to confirm that he sent a letter of

reference to AllMed. Dr. Nguyen stated that he did not send a letter, and instead tried to call

AllMed at least twice and left a voicemail because "we thought it best to call them directly."

121.    After Dr. Kling reminded Dr. Nguyen that AllMed requested a letter, not a phone call, Dr. Nguyen lied and said, "their letter did not indicate that they required a written response. Let us know how you'd like to proceed." Dr. Kling reiterated that AllMed required a letter.

122.    Dr.Nguyen finally mailed a letter to AllMed, after the deadline.

123.    Dr. Kling received a rejection letter from AllMed dated July 3, 2017.

124.    On or about September 25, 2017, Dr. Kling was notified of an advanced PGY-1 position at Greenwich. Charles Seelig, M.D. ("Dr. Seelig"), Greenwich Internal Medicine Residency Program Director, told Dr. Kling over the phone that he was their top candidate. Dr. Seelig requested a phone call with Dr. Rubin, who wrote a letter of recommendation for Dr. Kling for the position. Dr. Seelig explained his reason for the phone call was because he needed to do his due diligence.

125.    On September 29, 2017, Dr. Seelig emailed Dr. Kling an update stating that he had contacted Dr. Rubin's office, but was told that Dr. Kling would have to sign a release in order for this phone call to move forward.

126.    Initially, Dr. Seelig was told that this process would be facilitated by Kristen Lasher, UPMC GME Director, GME Compliance & Institutional Certification. Dr. Seelig assured Dr. Kling that the phone call was purely routine and not because he was concerned about Dr. Kling's qualifications.

127.    On October 2, 2017, Dr. Kling emailed Dr. Rubin and Dr. Seelig a signed letter authorizing Dr. Rubin to communicate with Dr. Seelig.

128.    In early October 2017, Dr. Kling spoke with Anna Roman PhD., ("Dr. Roman"), Vice President of UPMC GME, regarding the Greenwich position. Dr. Roman explained that Dr. Rubin would not be discussing anything over the phone; instead, Dr. Seelig would have to email written questions to Dr. Rubin.

129.     Dr. Kling updated Dr. Seelig regarding the new restrictions and provided Dr. Seelig with Dr. Roman's contact information. Dr. Seelig told Dr. Kling that written questions were "atypical" in response to his request for a brief phone call.

130.     Following this conversation, Dr. Seelig spoke with Dr. Roman. On or about October 3, 2017, Dr. Seelig emailed Dr. Kling, stating that it was no longer necessary for him to send written questions to Dr. Rubin because "I don't feel there is a point because he has said, in writing, what his evaluation of you is and I am sure this will not change."

131.     On October 7, 2017, Dr. Nguyen emailed Dr. Kling an authorization to communicate and release of liability form for Dr. Kling to sign.

132.     Upon information and belief, no other resident in the GME Department of Plastic Surgery at that time was asked to sign such a release.

133.      Dr. Kling refused to sign the release because it would grant broad authorization for the UPMC Entities and their agents to disseminate their discriminatory and unfounded opinions about Dr. Kling with impunity.

134.     Ultimately, Dr. Kling was not hired for the Greenwich position.

135.     The UPMC Entities and individual defendants also tried to dissuade Dr. Kling from pursuing another residency position and a career in clinical medicine, altogether.

136.     From February 2017 to January 2018, Ernest Manders, M.D. ("Dr. Manders"), Professor of Plastic Surgery at UPMC, harassed Dr. Kling with phone calls, emails, and texts asking what he was up to and attempting to dissuade Dr. Kling from a future career in medicine by suggesting he consider an MBA, JD or other advanced degree.

137.     Upon information and belief, Dr. Manders was directed to incessantly contact Dr. Kling by Dr. Nguyen and/or Dr. Losee.

138.     In addition, Dr. Nguyen's expressed written opinion of Dr. Kling continued to get

progressively worse. In a letter dated September 7, 2017, Dr. Nguyen wrote that  "Dr. Kling does

not have the capability to act in any capacity of any type of physician, let alone a plastic

surgeon."

139.     In addition, Dr. Nguyen's wrote, "…It was felt that the best way of supporting Russell

would be to strongly advise against him not to pursue further training in a clinical field of

medicine. Russell's strengths do not seem to lie in the clinical care of patients."

140.     This letter contradicts Dr. Nguyen's previous opinions about Dr. Kling, as he

recommended Dr. Kling for his unrestricted Pennsylvania medical license, and also is

diametrically opposed to opinions in Dr. Rubin's letter of recommendation, which was sent to

hundreds of residency programs.

141.     Based upon the above, GME and related entities including the individuals identified

through aiding and abetting, have violated the Americans With Disabilities Act, as amended,

Rehabilitation Act and Pennsylvania Human Relations Act including termination through the

non-renewal of the residency contract, failure to provide reasonable accommodations, improper

medical inquiries, breach of confidentiality provisions, and retaliation.

142.     Under the ADAAA, Rehabilitation Act and PHRA, Dr. Kling has a disability as defined

by statute to include an actual disability and was regarded as and/or a record of disability based

upon the neuropsychological examination, that the defendants required as part of the

accommodation process.

143.     As a proximate result of defendants' conduct, as alleged herein, Dr. Kling has suffered

significant and irreparable harm on both a personal and professional basis and seeks all available

remedies under state and federal law, including back pay, front pay, compensatory damages,

punitive damages, interest, attorney fees, costs, interest and equitable relief.

144.    Dr. Kling has exhausted all administrative remedies, as evidenced by the issuance of a

Right to Sue letter from the Equal Employment Opportunity Commission dated September 19,

2018.

145.    Plaintiff's claims under the Rehabilitation Act do not require administrative exhaustion.

## COUNT I

[Termination from Plastic Surgery Residency Program: Allegations of Defendant's Violations of
the Americans With Disabilities Act, Rehabilitation Act and Pennsylvania Human Relations Act

146.    Dr. Kling repeats and realleges all preceding paragraphs, as if fully set forth herein.

147.    The UPMC Entities have continuously been an employer within the meaning of §101(5)

of the ADA, 42 U.S.C.§12111(5) and has been a covered entity under §101(2) of the ADA.

148.    Dr. Kling was a qualified individual with a disability;

149.    Dr. Kling was, at all relevant times, capable of performing the essential functions of a

resident in plastic surgery, with or without accommodations.

150.    Dr. Kling was not allowed to return to work, because Dr. Kling was disabled, regarded as

disabled and/or had a record of disability within the meaning of the Americans With Disabilities

Act, Rehabilitation Act, and Pennsylvania Human Relations Act.

151.    As a proximate result of the unlawful employment practices of Defendants, Dr. Kling has

sustained the loss of wages, diminished earning capacity and other job benefits.

152.    As a proximate result of the unlawful employment practices of Defendants, Dr. Kling has

suffered continuous emotional upset, distress, mental anguish and inconvenience of  having been

deprived of equal unemployment opportunities based on his disability, and his perceived

disability or record of disability.

153.    Defendants unlawful employment practices, described above, were and are intentional.

Specifically, Defendants intentionally enforced their own ad hoc policies and/or refused to

comply with existing GME rules, regulations and protocols, in violation of Dr. Kling's federally and State protected rights under the ADA.

154.    Defendants unlawful employment practices, as set forth above. were done with malice or reckless indifference to Dr. Kling's federally and state protected rights.

155.    As a proximate result of their egregious acts and conduct, Defendants are liable to Dr. Kling for punitive damages.

## COUNT II

[Denial of Reasonable Accommodations in the Plastic Surgery Residency Program: Allegations of Defendants' Violation of the Americans With Disabilities Act, Rehabilitation Act and Pennsylvania Human Relations Act]

156.    Dr. Kling repeats and realleges all preceding paragraphs, as if fully set forth herein.

157.    Dr. Kling was, at all relevant times, capable of performing the essential functions of a resident in the plastic surgery department with or without accommodations. To the extent that Defendants maintain that Plaintiff would not have successfully completed a remedial year, Defendants failed to provide a reasonable accommodation, similar to remedial years being provided to other residents.

158.    Dr. Kling was not allowed to return to work, because Dr. Kling was disabled, regarded as disabled, and/or had a record of disability within the meaning of the American with Disabilities Act, Rehabilitation Act, and Pennsylvania Human Relations Act with or without accommodations.

159.    As a proximate result of this wrongful and illegal conduct, Defendants have caused Dr. Kling to sustain the loss of wages and other job benefits and to suffer continuous emotional distress and other mental harm and anguish.

160.    As a proximate result of their egregious acts and conduct, Defendants are liable to Dr. Kling for punitive damages.

## COUNT III

[ Denial of Reasonable Accommodations in Failure to Provide Non-Competitive Reassignment: Allegations of Defendants' Violation of the Americans With Disabilities Act, Rehabilitation Act and Pennsylvania Human Relations Act]

161.    Dr. Kling repeats and realleges all preceding paragraphs, as if fully set forth herein.

162.    Dr. Kling was, at all relevant times, capable of performing the essential functions of a resident in the plastic surgery department with or without accommodations.

163.    Dr. Kling identified and requested transfer or reassignment to other vacant and funded job opportunities to which he was qualified.

164.    Dr. Kling was denied such job opportunities by Defendants, because Dr. Kling was disabled, regarded as disabled, and/or had a record of disability within the meaning of the American with Disabilities Act, Rehabilitation Act, and Pennsylvania Human Relations Act with or without accommodations.

165.    As a proximate result of this wrongful and illegal conduct, Defendants have caused Dr. Kling to sustain the loss of wages and other job benefits and suffer continuous emotional distress and other mental harm and anguish.

166.    As a proximate result of their egregious acts and conduct, Defendants are liable to Dr. Kling for punitive damages.

## COUNT IV

[Medical Inquiry: Defendants' Violation of the ADAAA and Rehabilitation Act]

167.    Dr. Kling repeats and realleges all preceding paragraphs, as if fully set forth herein.

168.    Dr. Kling was required by Defendants to submit decades old medical records, neuropsychological testing, undergo drug and alcohol testing, and psychiatric and medical evaluation.

169.     Dr. Kling complied with all such requests to the best of his ability. Defendants misinterpreted and selectively disseminated the results in a discriminatory and retaliatory manner.

170.     Defendants' wrongful conduct, as described in this Complaint, constitutes discrimination on the basis of disability, in violation of the ADAAA and Rehabilitation Act and its implementing regulations, by requiring Dr. Kling to submit to medical examinations and disability related inquiries prior to and after a job offer, that are not job-related and consistent with business necessity and are unrelated to their ability to perform his job-related functions, 42 U.S.C. Section 12112(d)(2) and 29 C.F.R. Section 1630.13.

171.     Defendants' conduct constitutes discrimination on the basis of disability in violation of the ADAAA and Rehabilitation Act and its implementing regulations by requiring Dr. Kling to disclose overbroad medical history and/or medical records (including information wholly unrelated to the medical issues for which Defendant was purportedly evaluating the applicant's fitness for duty), 42 U.S.C. Section 12112(d)(3) and 29 C.F.R. Section 1630.14(b).

172.     As a proximate result of this wrongful and illegal conduct, defendants have caused Dr. Kling to sustain the loss of wages and other job benefits and suffer continuous emotional distress and other mental harm.

**COUNT V**

[Disclosure of an Employee's Handicap or Disability under PHRA (16 Pa. Code § 44.12]

173.     Dr. Kling repeats and realleges all preceding paragraphs, as if fully set forth herein.

174.     Dr. Nguyen, individually and within the scope of his employment, disclosed Dr. Kling's confidential medical information including, but not limited to, Dr. Kling's neuropsychological testing and results.

175.    Dr. Nguyen violated PHRA by failing to afford the confidentiality as medical records, of all information concerning Dr. Kling's disability, medical condition, medical history or medical testing and results, whether past, present or recurring.

176.    Dr. Nguyen violated PHRA by disseminating confidential information concerning Dr. Kling's disability, medical condition, medical history or medical testing and results, without any demonstrable business necessity for the dissemination of such confidential medical information.

177.    Dr. Nguyen violation of PHRA was intentional, willful and in reckless disregard and in violation of Dr. Kling's Hipaa rights and protections.

178.    As a proximate result of Dr. Nguyen's wrongful and illegal conduct, Dr. Kling has sustained damages involving his professional reputation and his ability to enter into prospective professional relationships has been impaired.

 179.    As a proximate result of Dr. Nguyen's wrongful and illegal conduct, Dr. Kling has sustained damages for continuous emotional distress and other mental harm and anguish.

## COUNT VI
### [Retaliation Under ADAAA, Rehabilitation Act and PHRA]

180.    Dr. Kling repeats and realleges all preceding paragraphs, as if fully set forth herein.

181.    After requesting reasonable accommodations and filing a grievance concerning the same, UPMC Entities and Dr. Nguyen retaliated against Dr. Kling.

182.    UPMC Entities and Dr. Nguyen retaliated against Dr. Kling by disseminating confidential information concerning Dr. Kling's disability, medical condition, medical history or medical testing and results, in violation of ADA and PHRA.

183.    UPMC Entities and Dr. Nguyen retaliated against Dr. Kling by disseminating confidential information concerning Dr. Kling's disability, medical condition, medical history or medical testing and results, in violation of ADA and PHRA.

184.    UPMC Entities and Dr. Nguyen retaliated against Dr. Kling by delaying his ability to secure his medical license.

185.    UPMC Entities and Dr. Nguyen retaliated against Dr. Kling by misrepresenting and/or misappropriating residency funding,

186.    UPMC Entities and Dr. Nguyen retaliated against Dr. Kling by improperly requiring him to release and waive rights in order to provide references.

187.    UPMC Entities and Dr. Nguyen retaliated against Dr. Kling by delaying him access to his own employment records.

188.    UPMC Entities and Dr. Nguyen retaliated against Dr. Kling by not reimbursing for DEA licensure.

189.    UPMC Entities and Dr. Nguyen retaliated against Dr. Kling by providing inaccurate and defamatory references both internally and externally, including false charges that Dr. Kling had been placed on probation.

190.    UPMC Entities and Dr. Nguyen retaliated against Dr. Kling by intentionally, willfully and in recklessly disregarding and violating Dr. Kling's Hipaa rights and protections.

191.    UPMC Entities and Dr. Nguyen retaliated against Dr. Kling by removing him from the workplace and placing him on administrative leave.

192.    UPMC Entities and Dr.  Nguyen retaliated against Dr. Kling by requiring him to submit to drug and alcohol testing despite the lack of any reasonable cause or employment necessity.

193.    UPMC Entities and Dr. Nguyen retaliated against Dr. Kling by tortiously interfering with Dr. Kling's prospective contractual relations, by writing and communicating untruthful, defamatory and discriminatory information to prospective employers and/or failing to timely respond to prospective employers' inquiries concerning Dr. Kling.

194.    UPMC Entities and Dr. Nguyen retaliated against Dr. Kling, by harassing his wife and causing marital strife.

195.    UPMC Entities and Dr. Nguyen retaliated against Dr. Kling by negligently inflicting emotional distress upon Dr. Kling, by their extreme and outrageous conduct, as alleged herein.

196.    UPMC Entities and Dr. Nguyen retaliated against Dr. Kling by intentionally and maliciously enforcing their own ad hoc policies and/or refusing to comply with existing GME rules, regulations and protocols, in violation of Dr. Kling's federally and State protected rights under the ADA and PHRA.

197.    The above described wrongful and illegal acts and conduct by UPMC Entities and Dr. Nguyen constitute retaliation in violation of the American With Disabilities Act as amended, Rehabilitation Act and PHRA.

198.    As a proximate result of defendants' retaliatory acts and conduct, Dr. Kling was refused both internal and external job opportunities.

199.    As a proximate result of this wrongful and illegal conduct, defendants have caused Dr. Kling to sustain the loss of wages and other job benefits.

200.    As a proximate result of Dr. Nguyen's wrongful and illegal conduct, Dr. Kling has sustained damages involving his professional reputation and his ability to enter into prospective professional relationships has been impaired.

201.    As a proximate result of Dr. Nguyen's wrongful and illegal conduct, Dr. Kling has sustained damages for continuous emotional distress and other mental harm and anguish.

## COUNT VII
### [Tortious Interference with Prospective Contract]

202.    Dr. Kling repeats and realleges all preceding paragraphs, as if fully set forth herein.

203.    Dr. Kling applied for and was considered for employment establishing prospective contractual relations including those described in paragraphs 113-134 of this Complaint.

204.    Defendants knew that Dr. Kling required letters of recommendation from them, in order for him to apply for and secure new employment in a medical field.

205.    Defendants acted with wrongful purpose by intentionally interfering with Dr. Kling's prospective contractual relations and communicating/ writing untruthful, defamatory and discriminatory letters to prospective employers and/or failing to timely respond to prospective employers' inquiries.

206.    Dr. Nguyen, individually and as an agent of UPMC Entities, and other agents of UPMC Entities purposefully intended harm and to prevent such prospective relations from occurring, through the dissemination of defamatory and false information concerning Plaintiff, causing him lost opportunities, financial and reputational harm.

207.    As a proximate result of Defendants' retaliatory acts and conduct, Dr. Kling was refused external job opportunities.

208.    As a proximate result of this wrongful and illegal conduct, Defendants have caused Dr. Kling to sustain the loss of wages and other job benefits.

209.    As a proximate result of GME/Dr. Nguyen's wrongful and illegal conduct, Dr. Kling has sustained damages involving his professional reputation and his ability to enter into prospective professional relationships has been impaired.

210.    As a proximate result of GME/Dr. Nguyen's wrongful and illegal conduct, Dr. Kling has sustained damages for continuous emotional distress and other mental harm and anguish.

211.    Plaintiff is entitled to punitive damages because Defendants' conduct was malicious, wanton, willful, and oppressive toward Plaintiff, and/or exhibited a reckless indifference to the rights of Plaintiff.

## COUNT VIII
### [Negligent Infliction of Emotional Distress]

212.    Dr. Kling repeats and realleges all preceding paragraphs, as if fully set forth herein.

213.   The wrongful acts, omissions and commissions, as set forth in paragraphs 182-196 of this Complaint constitute extreme and outrageous conduct on the part of Defendants, jointly and severally.

214.   Defendants, jointly and severally, engaged in this grossly negligent, willful and reckless extreme/outrageous conduct in order to punish and damage Dr. Kling on both a personal and professional level.

215.   Defendants negligently, willfully and recklessly intended to cause Dr. Kling severe emotional distress and mental anguish.

216.   As a proximate result of GME/Dr. Nguyen's extreme and outrageous wrongful and illegal conduct, Dr. Kling has sustained damages for continuous emotional distress and other mental harm and anguish.

217.   Dr. Kling's emotional distress and mental anguish is supported by competent medical evidence confirming the existence, cause and severity of his mental pain and suffering.

## PRAYER FOR RELIEF (All Counts)

**WHEREFORE**, Dr. Kling demands the following relief:

(1)   Judgment against Defendants, jointly and severally, in an amount to make him whole for all damages suffered by him as a result of defendants' violation of the Americans with Disabilities Act, Rehabilitation Act and Pennsylvania Human Relations Act, including, but not limited to, damages for back pay and benefits, front pay, compensatory damages, and all other damages recoverable under the above laws plus prejudgment, offset for tax consequences and other interest;

(2)   Judgment against Defendants, jointly and severally, in an amount to make him whole for all damages suffered by him as a result of defendants' tortious interference with Dr. Kling's prospective contractual rights, including damages involving his professional reputation and the impairment of his ability to enter into prospective professional relationships;

(3)     Judgment against Defendants, jointly and severally, in an amount to make him whole for all damages suffered by him as a result of defendants' negligent infliction of emotional distress;

(4)     Plaintiff is entitled to punitive damages on those claims other than the Rehabilitation Act and PHRA because Defendants' conduct was malicious, wanton, willful, and oppressive toward Plaintiff, and/or exhibited a reckless indifference to the rights of Plaintiff;

(5)     That this Court enjoin Defendants from further violating the above laws;

(6)     That this court direct Defendants to expunge Dr. Kling's GME records, to the extent of removing all improper and/or fabricated information and entries based upon the discriminatory, retaliatory and defamatory acts alleged herein;

(7)     That this Court order Defendants to reinstate Dr. Kling to the position he sought, when Defendants unlawfully disqualified him, with all seniority and benefits he would have otherwise accrued had not Defendants violated the above laws;

(8)     That this Court award Dr. Kling costs, including expert witness fees and attorneys' fees and

(9)     That this Court grant Plaintiff all other relief that he is entitled to under law and equity, as is deemed by the court to be just and proper under the circumstances.

## A JURY TRIAL IS DEMANDED

DATED: October 14, 2019

                                        BLAU,LEONARD LAW GROUP LLC

                                        By: _____
                                        STEVEN BENNETT BLAU
                                        SHELLY A. LEONARD
                                        23 Green Street, Suite 303
                                        Huntington, NY 11743
                                        (631) 458-1010 (telephone)
                                        (631) 458-1011 (facsimile)

                                        -and-

David M. Manes, Esq.
RUPPERT MANES NARAHARI, LLC
US Steel Tower, 48th Floor
600 Grant St, Suite 4875
Pittsburgh, PA 15219
412.626.5626 (Main)
412.650.4845 (Fax)

*Attorneys for Plaintiff*